IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

HENRY K. WADE,
   Plaintiff,

vs.            Case No. 3:04cv370/RS/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
   Defendant.

_____/

## REPORT AND RECOMMENDATION

   This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Act.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

   I.   PROCEDURAL HISTORY

   This suit involves two applications made under the Social Security Act ("the Act").  The first is an application for DIB under Title II of the Act, 42 U.S.C. §§ 401 *et seq*.  The second involves an application for SSI benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381

*et seq.* Plaintiff's applications were denied initially and on reconsideration (Tr. 17).[1]  On February 13, 2003, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 17- 23).  On September 1, 2004, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 4-7). The Appeals Council's action made the ALJ's decision the final decision of the Commissioner and, therefore, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

## II.    FINDINGS OF THE ALJ

On February 13, 2003, the ALJ made several findings relative to the issues raised in this appeal (Tr. 22-23).  The ALJ found that: 1) Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Act and is insured for benefits through February 13, 2003, the date of the ALJ's decision;  2) Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability; 3) Plaintiff has an impairment or a combination of impairments considered "severe" based on the requirements in 20 C.F.R. §§ 404.1520(b) and 416.920(b), including Human Immunodeficiency Virus ("HIV") and peripheral neuropathy;[2] 4) these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; 5) Plaintiff's allegations regarding his limitations are not totally credible; 6) Plaintiff has the residual functional capacity ("RFC") to perform light work activity; 7) Plaintiff is unable to perform any of his past relevant work; 8) Plaintiff is a younger individual; 9) Plaintiff has a "limited education"; 10) Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue; 11) Plaintiff has the RFC to perform a full range of light work; 12) Medical-Vocational Rule 202.18 directs a finding of "not disabled"; and 13) Plaintiff was not under a "disability," as defined in the Act, at any time through February

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on April 29, 2005 (Doc 14).

[2] Peripheral neuropathy is caused by damage to the peripheral nerves.  Peripheral Neuropathy, *available at http://www.aegis.org/topics/oi/oi-neuropathy.html* (Last visited January 20, 2006).  The most common symptom is severe, burning, aching pain in the feet and legs, which may prevent walking.  *Id.*

13, 2003 (Tr. 22-23).  Thus, the ALJ concluded that Plaintiff was not entitled to DIB or SSI benefits (Tr. 23).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps.  The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.      Personal History

Plaintiff testified at a hearing before the ALJ on December 5, 2002 as follows (Tr. 194-214). He was born on April 4, 1958, making him forty-four years old at the time of the hearing (Tr. 195). He lives with his sister in her house in Pensacola, Florida (Tr. 194-95, 198).  He attended school through tenth grade and later received a GED (Tr. 196).  He attended some college and is able to

read, write, and do simple arithmetic (Tr. 196-97, 210).  He is single and has no minor children (Tr. 210).

Plaintiff last worked on November 11, 2000 (Tr. 197).  Since that time he has sold some property for money, and his family has provided some money for him to live (*id.*).  His last job was as a kitchen manager at a barbeque restaurant where his duties included cooking and lifting bulk food items (Tr. 198-99).  He previously worked in construction, tearing out damaged materials, replacing drywall and baseboards, and painting (Tr. 200).

Plaintiff is approximately five and a half feet tall (Tr. 195).  He is HIV positive and has weight fluctuations due to his illness (Tr. 195-96).  His normal weight is 165 pounds, but he weighed 154 pounds at the time of the hearing (Tr. 195).

Plaintiff's primary complaint that prevents him from working is his neuropathy (Tr. 201).  When he takes a deep breath, he feels prickling all through is body (*id.*).  He can walk for a while, but then his left leg "flops" (*id.*).  He has problems holding things with his hands, which causes difficulty in driving and cooking (*id.*).  If he holds something in his hands for too long, his hands begin to throb and burn (Tr. 202).  Plaintiff also has a tumor in his left jaw that affects his salivary glands (Tr. 203).  At times he has a lump on his jaw and it often hurts (*id.*).  Plaintiff  has problems with diarrhea, which causes him to be afraid to go out in public (Tr. 206).

Plaintiff experiences side effects due to his medications, including neuropathy, cramping and aching, and high triglycerides (Tr. 205).  He has difficulty sleeping because he gets a numb feeling on whichever part of his body he lies on (Tr. 209).

On a typical day, Plaintiff gets up between 5:00 a.m. and 7:30 a.m. (Tr. 207).  He makes his bed, has breakfast, and sets out food to defrost for lunch and dinner (*id.*).  He tries to walk down to the end of the road early in the morning, and if his leg and foot do not hurt too bad, he will walk down to the end again (*id.*).  He then watches television and does laundry (Tr. 208).  After eating lunch, he takes a nap for a couple of hours and then gets up and has a snack (*id.*).  In the afternoon, he will take another walk or go out in the yard and play with the puppy (*id.*).  After supper he may sit out on the porch unless it is too hot (Tr. 209).  He usually falls asleep in his recliner around 8:00 p.m. and gets up and goes to bed around 9:00 p.m. (*id.*).

Plaintiff is able to take care of his personal needs, such as bathing and getting dressed, but

has difficulty shaving (Tr. 210).  His sister cooks food for him and freezes meals, and he is able to warm them up in the microwave (*id.*).  He is able to wash dishes and occasionally dusts, mops, sweeps, and vacuums (Tr. 211).  He has a driver's license, but does not own a vehicle (*id.*).  Since he had a wreck in February 2002, he has driven only four times (*id.*).  He does not attend church, go out to eat, go to the movies, or do any fishing (Tr. 212).

B.    Relevant Medical History

Plaintiff was initially diagnosed as HIV positive in 1995 by an unknown person with the Georgia Health Department (Tr. 56, 104).  He has received treatment for this since 1995, at first under a fictitious name (Tr. 56).  Plaintiff's HIV condition did not interfere with his ability to work until 1998 or 1999, at which time he began working less because of "sickness" and quit working entirely in November 2000 (*id.*).

The pertinent medical records in Plaintiff's file begin when Plaintiff was first seen by Donald R. Todd, M.D., an ear, nose and throat specialist, on November 28, 2000 (Tr. 140).  Plaintiff was evaluated for a cyst in the sinus, with difficulty breathing through the nose, and facial headaches (Tr. 137-44).  Plaintiff brought a CT scan with him for Dr. Todd's review (Tr. 140).  The scan was done on July 13, 2000, and it revealed a polyp in the left anterior ethmoid area, approximately 12mm in size, which Dr. Todd thought might be the cause of Plaintiff's left recurrent frontal headaches (*id.*).  Plaintiff advised that he had an accident at 18 months of age when his aunt was backing up her car and almost ran over his head (Tr. 139).  The CT scan revealed obvious fractures of the right orbit with a blow-out fracture of the medial floor (*id.*).  Dr. Todd documented that there was a questionable defect in the medial floor with some possible extrusion of fat, which may be the origin of the original polyp that fills 90% of the sinus (*id.*).  Intranasally, the inferior turbinates were large, and consistent with his physical examination, Plaintiff had difficulty breathing through his nose (*id.*).  Plaintiff reported decreased hearing, previous ear tubes, ringing in his ears, recurrent ear drainage, and recurrent ear infection (*id.*).  He  reported frequent mouth-breathing, sneezing, snoring, and he thought he had sleep apnea related to his nasal obstruction (*id.*).  Plaintiff also complained of skin rashes, tiredness, depression, arthritis, and HIV (*id.*).

On physical examination, Plaintiff's left ear was packed with epithelial debris (Tr. 138).  He had a recent myringotomy for middle ear effusion, and Dr. Todd suspected that the drainage and

wetness had triggered some irritation and epithelial shedding (*id.*).  He did not see any active infection (*id.*).  There was irritated dryness of the posterior pharynx, which suggested mouth-breathing (*id.*).  Dr. Todd believed that the thickness of the uvula, and somewhat of a web from the palate and uvula to the tonsils, may be additional factors in his snoring and nighttime breathing (*id.*).  Dr. Todd's impression was chronic polypoid sinusitis, concha bullosa, hypertrophy of the inferior turnbinates, blow out fracture of the right orbital floor, septal deviation, elongation of soft palate, history of Hepatitis B, and history of HIV infection (*id.*).  His plan included Bactroban and saline sprays twice a day, a full CT scan of the sinuses, and endoscopic sinus surgery (Tr. 137).

Plaintiff was seen five additional times by Dr. Todd in early 2001 for chronic ear infections (Tr. 133-36).  Dr. Todd also ordered a CT scan of Plaintiff's parotid salivary gland for evaluation of the nodule under his jaw; however, Plaintiff did not have the scan done due to his lack of medical insurance (*id.*).

Plaintiff was first seen by Barbara H. Wade, M.D., an infectious diseases specialist, on February 6, 2001 (Tr. 104).  He had previously been followed for his HIV infection at a clinic in Alabama (*id.*).   Complications from his HIV infection included shingles, lipodystrophy, hypertriglyceridemia, and oral thrush (*id.*).  His past medical history included a right sinus cavity cyst, a left neck tumor, and chronic Hepatitis B (*id.*).  Plaintiff reported feeling tired and down, having a low energy level, and feeling anxious (*id.*).  He further reported having several bouts of diarrhea each day, six to eight times on a good day (Tr. 105).  He related that he did not take Immodium on a regular basis because he was afraid it would hurt his liver (*id.*).  He got up at 3:30 that morning to start taking Immodium so he could go in for his appointment, and he always carries extra underwear because he often has accidents (*id.*).

On physical examination, Dr. Wade noted that Plaintiff's right tympanic membrane was gray and bulging, and his tongue was coated with a mild amount of white exudate (*id.*).  She further noted bilateral shoddy cervical lymphadenopathy, bilateral lymphadenopathy in the axillae, and some facial atrophy with prominence of his forehead and cheekbones (*id.*).  Dr. Wade's assessment was HIV infection, lipodystrophy, history of shingles, history of hypertriglyceridemia, right sinus cavity cyst, left neck tumor, chronic Hepatitis B, severe diarrhea, elevated blood pressure, and depression and anxiety (Tr. 105-06).  Laboratory work was ordered, and Plaintiff was directed to return for

follow up (Tr. 106).

Plaintiff was seen by Dr. Wade on March 1, 2001 in follow up for HIV infection (Tr. 103). At that time, he was taking four medications for his HIV (*id.*).  His problems included muscle cramping and pain in the bone and joints (*id.*).  He had been diagnosed with depression and was taking Zoloft for treatment (*id.*).  Overall, Plaintiff looked well (*id.*).  His CD4 count[3] was 861 and viral load was 2,188 (*id.*).  His liver enzymes were elevated approximately three times normal, his triglycerides were 742, and his cholesterol was 219 (*id.*).  Dr. Wade's assessment was HIV infection, chronic Hepatitis B infection, depression, and right sinus cavity cyst (*id.*).

Plaintiff was next seen by Dr. Wade on April 1, 2002 for complaints of sneezing, sore throat, and headaches (Tr. 167).  He also complained of significant problems with peripheral neuropathy (*id.*).  Dr. Wade's assessment was HIV infection, hyperlipidemia, history of asthma, and peripheral neuropathy (*id.*).  Due to the side effects Plaintiff was experiencing from the HIV medications, Dr. Wade put them on hold and planned to repeat Plaintiff's blood work in one month (*id.*).  Dr. Wade also planned to continue Lopid for the hyperlipidemia, and she prescribed medication for probable bronchitis (*id.*).  She noted that Plaintiff's peripheral neuropathy may slowly improve since the HIV medications were stopped, but she planned to continue Neurontin for his neuropathy (*id.*).

Plaintiff presented to Dr. Wade on May 13, 2002 for follow up regarding his HIV infection (Tr. 165).  Since she last saw Plaintiff, he had been having trouble with tiredness, but his diarrhea had improved and almost resolved, and his nighttime reflux had resolved (*id.*).  He continued to have peripheral neuropathy, but had stopped the Neurontin because he stopped taking two HIV medications that could cause peripheral neuropathy (*id.*).  He also complained of sinus congestion and coughing up green phlegm (*id.*).  He  stated that his appetite was good and that he does the yard

---

[3]The CD4 count reflects how strong the immune system is, how far HIV disease has advanced (the stage of the disease), and helps predict the risk of complications and debilitating infections.  CD4 Count, *available at http://www.labtestsonline.org/understanding/analytes/cd4/test.html* (Last visited January 20, 2006).  The CD4 count decreases as HIV disease progresses.  *Id.*  Normal CD4 counts in adults range from 500 to 1,500 cells per cubic millimeter of blood.  *Id.*  This test is used in combination with the viral load test, which measures the level of HIV in the blood, to determine the staging and outlook of the disease.  *Id.*  Viral load tests are reported as the number of HIV copies in a milliliter of blood.  HIV Viral Load, *available at http://www.labtestsonline.org/understanding/analytes/ viral_load/test.html* (Last visited January 20, 2006).  A high viral load  measurement  indicates that HIV is reproducing and the disease will likely progress faster than if the viral load is low.  *Id.*  A high viral load can be anywhere from 5,000 to 10,000 copies and can range as high as one million or more.  *Id.*  A low viral load is typically between 200 to 500 copies and indicates that HIV is not actively reproducing and the risk of disease progression is low.  *Id.*

and housework for exercise (*id.*).  Plaintiff's last blood work was done on May 2, 2002, and his CD4 count was 790, his viral load was 62,327, and his triglycerides had decreased from 3,612 to 279. Dr. Wade's assessment was HIV infection, peripheral neuropathy, probable bronchitis, hyperlipidemia, and elevated blood sugars (Tr. 165-66).  Dr. Wade noted that Plaintiff's HIV medications had been discontinued due to multiple side effects (Tr. 165).  She planned to repeat his blood work and have him return in six weeks (Tr. 166).  She also planned to restart Neurontin for the peripheral neuropathy and ordered medication to treat the bronchitis (*id.*).  Finally, Dr. Wade noted that Plaintiff was on Lopid, and his triglycerides had greatly decreased (*id.*).

Plaintiff was seen by Dr. Wade on May 24, 2002 with complaints of a lump on the side of his neck, a sharp pain on the right side of his face, and congestion (Tr. 158).  He denied nausea, vomiting, diarrhea and/or constipation (*id.*).  Dr. Wade's assessment was HIV infection, nasal congestion, hyperlipidemia, depression, and peripheral neuropathy (*id.*).  Plaintiff was taking no HIV medications, and Dr. Wade planned to repeat his viral load in June 2002 (*id.*).  She provided samples of Allegra for Plaintiff's congestion, instructed him to restart the Bactroban/normal saline nasal spray, and planned a CT scan of his sinuses (*id.*).  Dr. Wade noted that Plaintiff's hyperlipidemia had improved with the use of Lopid.  She planned to continue Zoloft for his depression, and Neurontin and Elavil for his peripheral neuropathy (*id.*).

Plaintiff underwent a CT scan of his sinuses on June 10, 2002, which revealed complete opacification of the right maxillary sinus and moderate mucosal thickening in the left maxillary sinus, along with scattered mucosal thickening in both ethmoid sinuses  (Tr. 155).

Plaintiff was seen by Dr. Todd on June 27, 2002 for follow up of his chronic sinusitis and left parotid tumor at the request of Dr. Wade (Tr. 153).  Dr. Todd noted that Plaintiff has some intermittent swelling of the area of the right salivary gland, suggesting sialadenitis[4] (*id.*).  Dr. Todd's impression was chronic right maxillary sinusitis with large retention cyst, mild mucosal thickening of the left maxillary sinus, recurrent upper respiratory infections, chronic right parotid sialadenitis,

---

[4]Sialadenitis is a condition characterized by inflammation and enlargement of one or more of the salivary glands, the glands that secrete saliva into the mouth.  Sialadenitis, *available at http://www.webmd.com/hw/health_guide _atoz/nord356.asp* (Last updated March 23, 2005).  Sialadenitis is often associated with pain, tenderness, redness, and gradual, localized swelling of the affected area.  *Id.*  The exact cause of sialadenitis is not known.  *Id.*

and possible Warthin tumor[5] of the left parotid salivary gland tail (*id.*).  His plan included Zicam spray for the next upper respiratory infection to see if it was a common head cold and a CT scan of the parotid salivary gland (*id.*).

Plaintiff returned to Dr. Wade on July 3, 2002 for follow up regarding his HIV infection (Tr. 163).  Plaintiff reported that his peripheral neuropathy had decreased in frequency, but when he did have the pain it was sharper in sensation (*id.*).  He reported that he used his Albuterol inhaler when he did a lot of heavy working, but otherwise did not use the inhaler (*id.*).  He denied nausea, vomiting, diarrhea, and/or constipation (*id.*).  Dr. Wade noted that Plaintiff's last blood work was done on June 10, 2002, at which time his CD4 count was 816 and his viral load was 51,358 (*id.*).  Dr. Wade's assessment included HIV infection, sinus problems, depression, peripheral neuropathy, and hypertriglyceridemia (*id.*).  Dr. Wade planned to continue holding his HIV medications and recheck his blood work in three months, obtain a CT scan of his parotid gland, continue Zoloft for his depression, continue Neurontin and increase the Elavil for his peripheral neuropathy, and monitor his triglycerides (*id.*)

Dr. Wade wrote a letter to Dr. Todd on July 29, 2002 regarding Dr. Todd's recommendation that Plaintiff have a CT scan of the parotid salivary gland (Tr. 156).  Dr. Wade informed Dr. Todd that Plaintiff did not have insurance and that his care was funded by a federal grant for care of HIV positive patients (*id.*).  In light of her limited knowledge of parotid tumors, Dr. Wade requested Dr. Todd's opinion regarding the necessity of the CT scan (*id.*).  Dr. Wade also informed Dr. Todd that Plaintiff's HIV status was stable, and his HIV medications had been discontinued due to a high triglyceride level (*id.*).  His lab work at the time did not indicate the need to restart the medications, but he was under close observation (*id.*).  Dr. Wade called Dr. Todd on August 2, 2002 to discuss the need for a scan (Tr. 152).  Although Plaintiff had some intermittent sialadenitis, Dr. Todd felt it was clear that his tumor was benign and the need for a CT scan of the parotid salivary gland was low priority (*id.*).

Dr. Wade completed a Physical Capacities Evaluation on October 23, 2002 (Tr. 168-69).  She opined that Plaintiff could sit five hours at a time and stand or walk three hours at a time in an

---

[5]Warthin's tumor is a benign tumor of the salivary glands.  <u>Warthin's Tumor</u>, *available at http://www.the doctorsdoctor.com/diseases/warthinstumor.htm* (Last updated July 15, 2005).

eight-

hour workday (Tr. 168). Plaintiff could occasionally lift up to twenty-five pounds and frequently lift up to ten pounds (*id.*). He could occasionally carry up to fifty pounds, frequently carry up to twenty pounds, and continuously carry up to five pounds (*id.*). Plaintiff could use his hands for repetitive actions such as grasping, fine manipulation, and pushing or pulling, and he was able to use his feet for repetitive movements such as pushing and pulling leg controls (*id.*). He was not able to climb, but was occasionally able to bend and squat and frequently able to crawl and reach (*id.*). Dr. Wade listed HIV, neuropathy, hypertriglyceridemia, depression, and anxiety as diagnoses (*id.*). Dr. Wade also completed a Clinical Assessment of Pain form (Tr. 169). According to Dr. Wade, Plaintiff's pain was present to such an extent as to be distracting to the adequate performance of work activities (*id.*). She further documented that Plaintiff's medications could cause side effects that impose some limitations upon Plaintiff, but not to such a degree as to create serious problems in most instances (*id.*).

      C.      Other Information Within Plaintiff's Claim File

      On February 7, 2001, Richard W. Lucey, M.D., performed a consultative examination (Tr. 96-98). Plaintiff reported a diagnosis of HIV since 1995 and the use of multiple medications (Tr. 96). He complained of chronic diarrhea, nausea, weakness, and fatigue (*id.*). Plaintiff also related a history of chronic otitis and chronic sinusitis and cysts in his right maxillary and frontal sinuses, for which he had been advised he needed surgery (Tr. 96-97). Plaintiff further reported a tumor behind his jaw, which he had been advised to have removed, but he could not afford the procedure (Tr. 96). Finally, Plaintiff reported a history of Hepatitis B and past surgery for ear tubes, tonsillectomy, and adenoidectomy (*id.*).

      Upon physical examination, Plaintiff's ears were clear (Tr. 97). He had a prominent mass under his jaw below the left ear, which was non-tender (*id.*). No cervical adenopathy was noted, and his abdomen was non-tender with no organomegaly or masses (*id.*). Plaintiff's lungs were clear, and his heart rate and rhythm were regular (*id.*). Plaintiff's upper extremity strength was full ("5/5"), he had normal fine manipulatory movements, full range of motion of all major joints, normal deep tendon reflexes, and no weakness, atrophy, sensory deficits, or joint deformities (*id.*). In Plaintiff's lower extremities, he had no effusion, crepitus, laxity or joint deformities, no edema or varicosities,

his deep tendon reflexes were normal, peripheral circulation was intact, he had full range of motion of all major joints, and he had normal deep tendon reflexes (*id.*).  Dr. Lucey's appraisal was HIV with associated chronic diarrhea, nausea, weakness and fatigue, history of Hepatitis B, history of recurrent left neck mass, and history of sinus cyst and chronic sinusitis (Tr. 98).

A Physical RFC Assessment was completed on June 25, 2001 (Tr. 109-16).  According to the physician, Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk six hours in an eight-hour workday (Tr. 110).  No postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 111-13).

A consultative examination was performed by Frank A. Brown, Ph.D., on July 11, 2001 (Tr. 117-18).  Dr. Brown noted that Plaintiff exhibited some problems with concentration, difficulty sleeping, withdrawal, and a reduction in interests (Tr. 118).  Plaintiff had suicidal thoughts at times, but no suicidal impulse or intent or plan (*id.*).  Dr. Brown's diagnosis was major depression that was moderate in severity (*id.*).  He noted that Plaintiff was taking Zoloft, but he thought Plaintiff would benefit from personal counseling (*id.*).

A Psychiatric Review Technique was completed by T. Wayne Conger, Ph.D., on August 9, 2001 (Tr. 119-23).  Plaintiff was diagnosed with adjustment disorder with depressed mood, but the impairment was not severe (Tr. 119-20, 123).   Dr. Conger opined that Plaintiff was not limited in activities of daily living or maintaining social functioning, and he had no episodes of repeated decompensation (Tr. 121).  He also opined that Plaintiff was mildly limited in maintaining concentration, persistence, or pace (*id.*).  According to Dr. Conger, Plaintiff was physically limited to some extent, but was mentally capable of performing a wide range of routine activities of daily living (Tr. 123).  Further, he thought that Plaintiff may experience some depression related to his physical problems, but found that he displayed an adequate mental status and could relate in a socially appropriate manner (*id.*).

On August 16, 2001, N.L. Kopitnik, D.O., J.D., completed a Physical RFC Assessment (Tr. 125-32).  According to Dr. Kopitnik, Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk six hours in an eight-hour workday (Tr. 126). No postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 127-29).

V.      DISCUSSION

Plaintiff contends that the ALJ erred in finding Plaintiff's depression non-severe and in finding that Plaintiff retained the RFC to perform light work (Doc. 16).  The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole and should be affirmed (Doc. 19).

A.  Finding that Plaintiff's Depression is Non-Severe

At step two of the evaluation sequence, the ALJ found that Plaintiff had two physical impairments that were "severe" within the meaning of the Regulations (Tr. 19, 22).  However, the ALJ concluded that Plaintiff's mental impairment (i.e., his depression) was non-severe, noting: 1) that this finding was consistent with the state agency medical consultant's opinion [Dr. Conger], 2) that Plaintiff had not received any mental health treatment other than receiving Zoloft from his general practitioner [Dr. Wade],[6] and 3) that the consulting psychologist [Dr. Brown] noted moderate major depression with some withdrawal, problems with concentration, difficulty sleeping, and reduction in interests. (Tr. 19).  Plaintiff contends that the ALJ erred in reaching this conclusion because it is based upon the opinion of a non-examining physician, it is contrary to the opinion of Plaintiff's treating physician [Dr. Wade], and it is not supported by Dr. Brown's records (Doc. 16).

The ALJ must determine at step two whether the claimant has a severe impairment.  An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities.  20 C.F.R. § 1520(c).  The burden at this step is on the claimant.  Chester, 792 F.2d at 131.  The Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe:
> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
> (b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--  (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment;  (5) Responding appropriately to supervision, co-workers and usual work

[6]It is believed that the ALJ is referring to Dr. Wade, although she is an infectious diseases specialist, because she is the physician that prescribed Zoloft.

Case No. 3:04cv370/RS/EMT

situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether impairments are severe.  The ruling provides in part:

> As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe"and a finding of "not disabled" is made at this step when medical evidence establishes only a *slight abnormality* or a combination of slight abnormalities which would have *no more than a minimal effect* on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856 (emphasis added).

In Brady v. Heckler, 724 F.2d. 914, 920 (11th Cir. 1984) the Eleventh Circuit used the same test adopted in SSR 85-28 to hold that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."  The Eleventh Circuit has further interpreted the regulations to mean that "only claims based on the most trivial impairments [can] be rejected" at step two, noting that step two is a "threshold inquiry" and that a claimant's "burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

Additionally, the evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in eight diagnostic categories.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work (i.e., limitations in functional areas deemed essential to work).

The severity of a mental disorder is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the

listings for mental disorders, or in this case, paragraph B of Listing 12.04 (Affective Disorders), which lists the following four criteria: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively, and on a sustained basis.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Here, the ALJ evaluated Plaintiff's depression under the "B" criteria of Listing 12.04 and found that Plaintiff has "mild limitation in the activities of daily living and mild limitation in social functioning.  He has mild limitation in concentration, persistence, or pace, and he experiences no episodes of decompensation." (Tr. 19).  The ALJ further noted that Plaintiff manages to walk for exercise, do housework, and care for his personal needs (*id.*).  This court concludes that the ALJ did not err in finding Plaintiff's depression non-severe.

First, the ALJ correctly noted that this finding was consistent with the opinion of Dr. Conger, a non-examining state agency medical consultant.[7]  Dr. Conger analyzed Plaintiff's depression under Listing 12.04 (Tr. 119, 121).  He found that Plaintiff had *no* restriction of activities of daily living; *no* difficulties in maintaining social functioning; *no* repeated episodes of decompensation; and only *mild* difficulties in maintaining concentration, persistence, or pace (Tr. 121).  In increasing severity, the following choices for rating Plaintiff's functional limitations were available to Dr. Conger: none, mild, moderate, marked, and extreme.  It is obvious, therefore, that Dr. Conger felt Plaintiff's mental limitations would have *no more than a minimal effect* on his ability to work.  Although Dr. Conger was a non-examining physician, and, therefore, his opinion is entitled to little weight, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985), the ALJ must nevertheless consider his findings.  *See* 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2).

Second, the ALJ accurately noted that Plaintiff had not received any mental health treatment

---

[7]Dr. Conger's opinion was actually less restrictive than that found by the ALJ.

other than receiving Zoloft prescribed by Dr. Wade, an infectious diseases specialist.[8]  Dr. Wade treated Plaintiff from February 6, 2001 to March 1, 2001 (Tr. 101-08) and again from April 1, 2002 to July 3, 2002 (Tr. 159-67), for Plaintiff's HIV and related problems.  During her initial meeting with Plaintiff on February 6, 2001, he told her that anxiety had always been a problem and described himself as a "worrywart," but reported no suicidal ideation (Tr. 104).  Upon further discussion, Plaintiff agreed to try an antidepressant for "mood stabilization and improvement in anxiety," and was provided with a four-week supply of Zoloft samples (Tr. 106).  His next visit with Dr. Wade was on March 1, 2001, at which time she noted that Plaintiff had "some depression," and she provided another month's supply of Zoloft samples (Tr. 103).  The treatment notes from Plaintiff's next two visits with Dr. Wade, on April 1, 2002 (more than one year after his previous visit) and May 13, 2002, document that he was taking Zoloft, but do not reflect that he was experiencing any signs or symptoms of depression or anxiety (Tr. 165-67).  Dr. Wade's notes, however, are extensive and discuss other problems in detail, such as Plaintiff's sinus congestion and hyperlipidemia (*id.*).  Additionally, the treatment notes from Plaintiff's last two visits with Dr. Wade, on May 24, 2002 and July 3, 2002, while also detailed, merely list a diagnosis of depression, but do not reflect that Plaintiff was experiencing any signs or symptoms of depression or anxiety (Tr. 163, 164).

    Although Dr. Wade's notes document a diagnosis of depression, none suggest that Plaintiff's depression was anywhere close to severe or that it caused any significant concern to Dr. Wade.  Dr. Wade's continuation of Zoloft (as opposed to trials of other antidepressant medications), along with her lack of documentation regarding any signs or symptoms of depression following the initial visit, suggest that Plaintiff's depression was adequately treated and under control.  Thus, Plaintiff's assertion that Dr. Wade found that Plaintiff "suffers from significant, or 'moderate,' depression which can reasonably be expected to impose significant non-exertional limitations on his ability to sustain employment" (Doc. 16 at 15), is not well-founded.  This court concludes, based upon of review of Dr. Wade's records, that she simply did not make this finding.  Thus, the ALJ's finding is not contrary to her opinion.  Even if Dr. Wade's opinion was as suggested by Plaintiff, Title 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5) provide that "more weight [is given] to the opinion of

---

[8]Dr. Wade is listed as an infectious diseases specialist in the American Medical Association's listing of physicians, *available at http://www.ama-assn.org/* under "Doctor Finder" (Last visited January 27, 2006).

a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Dr. Wade is not a specialist in mental health disorders.

Plaintiff's other treating physician was Dr. Todd, an ear, nose and throat specialist, who treated Plaintiff from November 15, 2000 to August 2, 2002 (Tr. 133-54). His records document that Plaintiff self-reported depression (*see* Tr. 139, 144), but they show no referral for psychological treatment, and no prescriptions by Dr. Todd for antidepressant medications. In fact, Plaintiff's depression is mentioned nowhere in Dr. Todd's treatment notes other than Plaintiff's own report on one occasion and Dr. Todd's notation of that report (*id.*). Accordingly, neither treating physician has rendered an opinion that is inconsistent with the ALJ's finding that Plaintiff's depression was non-severe.

Third, the ALJ's opinion states that he relied upon records from Dr. Brown, a consulting psychologist, in determining that Plaintiff's depression was non-severe. Specifically, the ALJ stated that Dr. Brown "noted moderate Major Depression with some withdrawal, problems with concentration, difficulty sleeping, and reduction in interests" (Tr. 19). Plaintiff asserts that the ALJ either implicitly rejected Dr. Brown's opinions or erred in relying upon them because, in actuality, they support a finding of a severe mental impairment (Doc. 16).

Dr. Brown's records consist of a two-page report that was produced following a one-time evaluation of Plaintiff on July 11, 2001 (Tr. 117-18). Among other findings, Dr. Brown found that Plaintiff had "very good" short and long-term memory and was able to provide a detailed history, although he had some concentration deficits (Tr. 117). He was oriented to time, place and person, and he spoke quickly and with clear articulation (*id.*). His thought processes were lengthy and logical, and his affect was appropriate (*id.*). Plaintiff admitted to "some" depression, but stated that he tries to stay positive (*id.*). He gave no indication of hallucinations or delusions, showed no confusion, and had good insight (*id.*). Plaintiff discussed his medical condition at length, as well as many of the unpleasant symptoms and side effects caused by HIV and HIV medications (Tr. 117-18). He revealed that he has lost interest in activities he previously enjoyed, including dating and socializing (Tr. 118). He does not want to pass his disease on to anyone else and fears being embarrassed by his diarrhea (*id.*). Dr. Brown noted that Plaintiff has never received mental health counseling or treatment, other than the Zoloft prescribed by Dr. Wade (*id.*). In conclusion, he

diagnosed Plaintiff with "Major Depression that is moderate in severity" (*id.*).  He noted that Plaintiff exhibited some "withdrawal, problems with concentration, difficulty sleeping, and a reduction in his interests," and noted his belief that Plaintiff would benefit from "some personal counseling . . . aimed at helping him adjust to being more dependent in his daily life" (*id.*).  Notably, Dr. Brown did not specifically address the four criteria found in Listing 12.04, as did Dr. Conger.  However, Dr. Brown's report does not suggest that Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

Dr. Brown did diagnose Plaintiff with major depression (Tr. 118).  Major depression is diagnosed when a person reports at least five depressive symptoms, such as fatigue, sadness, irritability, difficulty concentrating, and helplessness, that persist for at least two weeks.  *See* search result for "Major Depression," *available at  http://www.mercksource.com/* (Last visited January 27, 2006); Depression, *available at http://www.emedicine.com/med/topic532.htm* (Last updated March 29, 2005).  In addition, people with major depression often have behavioral changes, such as altered eating and sleeping patterns.  *Id.*  Accordingly, a diagnosis of major depression does not compel a finding that Plaintiff's impairment was severe because the diagnosis does not, in and of itself, establish the criteria necessary under the Commissioner's regulations, especially considering Dr. Brown's opinion that Plaintiff's condition was only moderate.  Moreover, Dr. Brown felt that Plaintiff was quite capable of communicating effectively, remembering, speaking logically, and acting appropriately.  Thus, the ALJ did not err in concluding that Dr. Brown's report supported his finding of a non-severe mental impairment.

B.  Finding that Plaintiff Retained the RFC to Perform Light Work

Plaintiff contends the ALJ erred in finding that he retained the RFC to perform light work because that finding is not supported by substantial evidence of record (Doc. 16 at 4-11).  Specifically, Plaintiff contends that the finding is inconsistent with the records of Dr. Wade, a treating physician, and Dr. Lucey, a consultative examiner (*id.*).  Plaintiff further contends that, although the ALJ's RFC finding is consistent with the findings of two consultative examiners, their findings are inconsistent with Dr. Wade's, and therefore it was impermissible to rely upon them

(*id.*).

> Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Dr. Wade completed a Physical Capacities Evaluation on October 23, 2002 (Tr. 168). She found that Plaintiff could *lift* up to twenty pounds frequently and twenty-five pounds occasionally, and he could *carry* up to five pounds continuously, twenty-five pounds frequently, and fifty pounds occasionally (*id.*). She also found that Plaintiff could use his hands and feet for every sort of repetitive action or movement, and he could occasionally bend and squat, frequently crawl and reach, but never climb (*id.*). None of these restrictions prevent Plaintiff from performing light work as defined above; in fact, many are less restrictive that what is required for light activity.

Dr. Wade further opined that Plaintiff could sit a total of five hours at one time, for a total of five hours in an eight-hour work day, and stand or walk a total of three hours at one time, for a total of three hours in an eight-hour work day (*id.*). Plaintiff contends that Dr. Wade's standing/walking restrictions prevent him from performing light work and instead limit Plaintiff to "sedentary work," because Plaintiff could not "frequently" walk in an eight-hour workday.

> Sedentary work is defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Further, 20 C.F.R. Part 404, Subpt. P, App. 2 (§ 201.00(h)(4)), states that sedentary work "represents a significantly restricted range of work, and individuals with a maximum sustained work capability limited to sedentary work have very serious functional limitations."

Dr. Wade was never presented with the Commissioner's definitions of the terms "light" and

"sedentary" work; however, the opinions expressed on her functional capacity evaluation are compatible with "light" work.  Morever, nothing in her medical records supports a finding that Plaintiff was capable only of sedentary work.  Thus, this court concludes that the ALJ's RFC finding was consistent with Dr. Wade's opinion.

In addition to considering Dr. Wade's records, the ALJ also considered the other evidence of record in determining Plaintiff's RFC, as required in the regulations, and his determination is well-supported by the overall record evidence.

The ALJ discussed the findings of Dr. Lucey, a consultative examiner (Tr. 20).  Dr. Lucey found that Plaintiff's upper extremity strength was full ("5/5"), he had normal fine manipulatory movements, full range of motion of all major joints, normal deep tendon reflexes, and no weakness, atrophy, sensory deficits, or joint deformities (Tr. 97).  In Plaintiff's lower extremities, he had no effusion, crepitus, laxity or joint deformities, no edema or varicosities, his deep tendon reflexes were normal, peripheral circulation was intact, he had full range of motion of all major joints, and normal deep tendon reflexes (*id.*).  Plaintiff contends Dr. Lucey's opinion does not support the ALJ's RFC finding, but this court again disagrees.

Furthermore, two non-examining physicians reached identical conclusions, finding that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk six hours in an eight-hour workday (Tr. 110, 126).  They also both found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 111-13, 127-29).

The only opinion discounted by the ALJ was that of Dr. Wade concerning Plaintiff's pain (Tr. 20).  Dr. Wade asserted that Plaintiff's pain "would be distracting to the adequate performance of work activities" (Tr. 169), but the ALJ found this opinion to be inconsistent with Dr. Wade's treatment notes and with the consulting physician's examination (Tr. 20).  The ALJ also found that Plaintiff's allegations regarding his limitations were not fully credible, citing Plaintiff's medial history and daily activities (Tr. 21).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical

condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that

[the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).   The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[9]   People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

This court finds that the ALJ did not err in assessing Plaintiff's pain.  Although medical evidence demonstrates significant limitations, it does not support the presence of disabling symptoms and limitations.  Additionally, while Plaintiff's underlying medical condition could reasonably be expected to give rise to pain and limitation, the evidence as a whole simply does not support a finding that Plaintiff experienced pain or mental limitations of a disabling level.

First, Dr. Lucey examined Plaintiff on February 7, 2001, and, as discussed above, found no disabling physical limitations (Tr. 97-98).  Second, consultative examining psychologist, Dr. Brown

---

[9]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

noted that Plaintiff had no physical aids and no obvious physical handicaps (Tr. 117).  Third, as noted by the ALJ, Plaintiff took anti-viral medications from 1996 through 2000, and Dr. Wade stated that Plaintiff did not have any history of high viral loads that she knew of (Tr. 20, 103).  Although Plaintiff reported six to eight bouts of diarrhea per day, he reported great improvement and near resolution of his diarrhea and reflux on May 13, 2002 (Tr. 20, 165).  On May 24, 2002, Plaintiff was not taking any antiretovirals, and on July 3, 2002, treatment notes revealed a decrease in viral loads (Tr. 20, 163-64).  On July 29, 2002, Dr. Wade described Plaintiff as quite stable with a CD4 count well within the normal range (Tr. 20,156).  On August 2, 2002, Dr. Todd noted that Plaintiff was simply being monitored and not having any HIV treatment until such time as his CD4 or viral count became significantly abnormal (Tr. 20, 152).  Furthermore, as discussed above, Dr. Wade's functional capacity evaluation reveals her belief that Plaintiff had significant physical abilities (Tr. 168).  The absence of an objective medical basis to support the degree of severity of subjective complaints is an important factor to consider in evaluating the credibility of testimony and complaints.  *See* 20 C.F.R. §§ 404.1529, 416.929.  Furthermore, "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir.1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).

Moreover, as noted by the ALJ, Plaintiff reported activities that are inconsistent with a disabling degree of limitation and support an ability to perform a light range of work activity (Tr. 21).  The record shows that Plaintiff cared for his personal needs, cooked, shopped, washed dishes, dusted, watched television, walked, swept, mopped, vacuumed, drove, played with his puppy, and made his bed (Tr. 21, 57, 60, 66-69, 81, 118, 207-08, 210-12).  He also reported, on July 3, 2002, that he uses an inhaler "when he does a lot of heavy working" (Tr. 163).  The ALJ may consider such daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* Macia v. Bowen, 829 F.2d1009, 1012 (11th Cir. 1987); 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I).

For the foregoing reasons, this court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Furthermore, Plaintiff has failed to show that

the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 31ˢᵗ day of January 2006.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11ᵗʰ Cir. 1988).**